**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS<br><br>and<br><br>NATURAL GAS SERVICES GROUP, INC.,<br><br>              Plaintiffs,<br><br>v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>and<br><br>GARY GENSLER, in his official capacity as Chair of the SEC,<br><br>              Defendants. | No. 7:22-cv-163 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      The American public markets have long served as our nation's essential engine of economic growth, financing corporate investment in infrastructure, research, and the human talent that propels business success. The country as a whole reaps the benefits: Expanding businesses create millions of jobs; this growth lifts the national economy; and individual investments in the public markets secure the retirements of Americans across the country.

2.      In exchange for the investment of capital, publicly traded companies generally provide shareholders the right to participate in the most substantial questions of corporate governance. Shareholders are often called upon to elect directors, approve mergers or acquisitions, and determine the issuance of dividends, along with a host of other important issues. Many of these votes are cast via proxy by institutional investors and investment advisers, who make both

investing and voting decisions on behalf of the everyday Americans whose retirement and other investments they manage.

3.      Vibrant public markets thus depend on productive engagement between company management and shareholders. And for shareholders or their proxies to make informed decisions, they must possess accurate and complete information. Accordingly, the transmission of correct and complete information is essential to both securities issuers and investors.

4.      Certain entities, often called proxy advisory firms or proxy voting advice businesses (sometimes abbreviated as PVABs), now issue proxy voting advice regarding a wide array of publicly traded companies. These proxy advisory firms purport to advise institutional investors, investment advisers, and numerous other stakeholders as to how their votes should be cast.

5.      Today, these entities—largely a duopoly of two firms, Institutional Shareholder Services (ISS) and Glass Lewis—wield outsized influence on proxy voting. *See, e.g.*, *See Proxy Voting Advice*, 87 Fed. Reg. 43,168, 43,183-43,184 n.259 (July 19, 2022) ("2022 Rescission") (quoting a third-party report to the effect that "today the market is essentially a duopoly consisting of Institutional Shareholder Services and Glass Lewis & Co.") (ellipses omitted). Indeed, institutional investors controlling over *$5 trillion* in assets under management "voted in lockstep alignment with either ISS or Glass Lewis in 2020," with the result that these proxy firms' recommendations directed those institutions' votes on over 100,000 individual corporate resolutions that year. *See* Paul Rose, *Proxy Advisors & Market Power: A Review of Institutional Investor Robovoting* 10-11 (Apr. 2021), perma.cc/U2HV-DMRN. As the SEC has recognized, ensuring "the transparency, accuracy, and completeness of the information provided to clients of proxy voting advice businesses in connection with their voting decisions" is therefore critical. *Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082, 55,083 (Sept. 3, 2020) ("2020 Rule").

6.      The recommendations issued by these proxy advisory firms routinely provide investors and other proxy voters with false and misleading information. This creates an

unacceptable potential for critical corporate decisions to be made on the basis of inaccurate or incomplete facts. And proxy advisory firms have frequently been unwilling to issue corrections even when they are notified of errors in their reporting.

7.      Grave concerns have also arisen as to whether these firms, which issue advice intentionally impacting the nation's public markets, harbor significant conflicts of interest. ISS, for example, sells corporate governance consulting services to the very same companies about which it makes proxy voting recommendations on the basis of its governance policies, creating strong incentives for companies to purchase its consulting services.

8.      Further, proxy advisory firms often fail to provide any transparency regarding the creation of their putative corporate governance standards—and how those standards are related to the creation of value for shareholders. Instead, these firms often adopt one-size-fits-all governance positions, without any analysis as to whether these measures would enhance value for the *specific* company they are evaluating.

9.      Proxy advisory firms also regularly engage in practices that directly translate their recommendations into voting power, such as a practice known as "robo-voting," through which the firms directly cast their clients' votes (rather than just providing voting recommendations). These practices not only deny companies the opportunity to meaningfully respond to proxy advisory firms' reports, but also compound any conflicts or errors that the reports contain.

10.      In view of these serious concerns, the United States Securities and Exchange Commission (SEC) extensively investigated—over a period of a decade, and under Presidents and SEC Chairs of both political parties—whether it should implement basic safeguards with respect to proxy voting advice. After collecting numerous examples of voting advice offered notwithstanding an undisclosed conflict of interest, as well as examples of routine inaccurate information and of companies' inability to meaningfully respond to proxy advisory firms' reports, the SEC in 2020 promulgated a workable compromise rule to impose modest protections for investors and issuers alike. *See generally* 2020 Rule, 85 Fed. Reg. 55,082. Indeed, the 2020 Rule imposed significantly *less* onerous obligations on proxy advisory firms than the SEC's original

proposal from 2019; the SEC reduced the obligations specifically in response to concerns voiced by proxy advisory firms. *See id.* at 55,101-55,118 (describing changes from the 2019 Proposed Rule to the final 2020 Rule).

11.     In summary, the 2020 Rule clarifies that the provision of proxy voting advice generally constitutes a solicitation under the federal proxy rules. Usually, entities soliciting a proxy are subject to various information and filing requirements. The Rule exempts proxy firms from these requirements, provided that they disclose potential conflicts of interest to their clients, supply companies subject to their analyses with information about their final voting recommendations, and notify their clients prior to the vote if the subject companies respond to their recommendations. It also subjects proxy firms to the federal proxy rules' antifraud provisions. The Rule thus functions as an exemption to more burdensome requirements to which the proxy firms' activity would normally subject them under federal law.

12.     Following the confirmation of a new Chair in April 2021, however, the SEC abruptly changed course. After first suspending the requirement that proxy advisory firms comply with the 2020 Rule while it remained on the books—an unlawful action that Plaintiffs have separately challenged in court—the agency has now rescinded two critical pieces of the 2020 Rule: (1) the requirement that proxy advisory firms provide their analyses to the subject companies at least at the same time that said analyses are made available to their clients, and provide a mechanism by which those clients can become aware of any responses from the subject companies; and (2) a note to the antifraud rule clarifying the ways in which proxy advisory firms, depending on the facts and circumstances, may be liable for misrepresentations in connection with proxy solicitation. *See generally* 2022 Rescission, 87 Fed. Reg. 43,168.

13.     The 2022 Rescission is both procedurally defective and arbitrary and capricious, and therefore must be set aside under the Administrative Procedure Act (APA). The agency has come to a completely opposite outcome to that reached only two years ago, and it has done so on the basis of the exact same factual record that drove the SEC to adopt the 2020 Rule in the first

place. The SEC does not—no doubt because it cannot—offer any compelling justification for why the exact same factual record requires a different result this time around.

14.     To the extent the agency even attempts an explanation, its contentions are mere platitudes. The SEC notes that some market participants have raised concerns that the 2020 Rule could endanger the "timeliness" and "independence" of proxy voting advice, but the agency does not even attempt to describe *why* that would be the case—that is, the actual mechanisms by which that harm is supposed to occur—or what has changed in the two years since the agency firmly concluded that the 2020 Rule "*does not* create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted." 2020 Rule, 85 Fed. Reg. at 55,112 (emphasis added). The APA requires much more than that. And as described fully below, additional inconsistencies and failure of reasoning fully infect the 2022 Rescission, requiring its vacatur many times over.

15.     In sum, the SEC's decision arbitrarily to turn its back on a decade-long bipartisan policymaking process immediately harms publicly traded companies and their shareholders, precluding them from receiving the disclosures that the SEC earlier determined were essential to protect the public markets. Because the 2022 Rescission is both substantively and procedurally unlawful, the Court should set it aside.

## PARTIES

16.     Plaintiff National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12.8 million Americans, contributes roughly $2.77 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly two-thirds of private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

17.    Many of the NAM's members are publicly traded corporations. Part of the NAM's mission, accordingly, is to advocate for rules that ensure accurate and transparent information is provided to these businesses and their shareholders in the context of annual shareholder meetings, at which critical decisions are made that impact the governance of public companies and the performance of their shareholders' investments. That is, the NAM's members have an interest in ensuring that, when third parties seek to provide advice as to how shareholders and their proxies vote on matters of corporate governance, the information provided is accurate and complete and conflicts of interest are appropriately disclosed.

18.    For that reason, the NAM advocated for strong protections throughout the bipartisan process that culminated in the 2020 Rule, which is of the utmost concern to many of its members. *See, e.g.*, Comment of the National Association of Manufacturers, File No. S7-22-19, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (Feb. 3, 2020), perma.cc/CSA2-XEUN; File No. 4-725: *SEC Staff Roundtable on the Proxy Process*, Ltr. to Brent J. Fields (Mar. 5, 2019), perma.cc/S6QU-UDVS; *Meeting with National Association of Manufacturers*, File No. S7-22-19 (May 7, 2020), perma.cc/P3XC-8WZ6.

19.    The NAM also provided comment on the SEC's 2021 proposal to rescind the 2020 Rule, strongly advising the agency to reconsider. *See* Comment of the National Association of Manufacturers, File No. S7-17-21, Proxy Voting Advice (Dec. 24, 2022), perma.cc/FT3P-JWFB.

20.    Likewise, numerous members of the NAM either provided their own comments during the 2020 and 2021 rulemaking processes, urging the SEC to adopt (and not rescind) protections to promote transparent, accurate, and complete information, or have themselves been forced to file supplemental proxy materials with the SEC identifying and correcting errors, omissions, and misrepresentations in proxy advisory firms' proxy analyses and voting recommendations.[1] The 2020 Rule, if properly implemented, would have remediated the injuries

---

[1]    *See, e.g.*, Abbott Laboratories supplemental proxy statement, perma.cc/AUB2-7ZMA; American Outdoor Brands Corporation supplemental proxy statement, perma.cc/C93J-KJMW; Ball Corporation comment letter, perma.cc/496F-VRBE; Ecolab Inc. comment letter, perma.cc/2DKG-LNJY; Exxon Mobil Corporation supplemental proxy statement,

to public companies upon the issuance of erroneous, misleading, or conflicted advice. Ultimately, many of the NAM's members will be harmed by the SEC's arbitrary and capricious rescission of the well-considered 2020 Rule.

21.     The NAM is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

22.     Plaintiff Natural Gas Services Group, Inc. (NGS) is a leading provider of gas compression equipment to the natural gas industry. NGS is incorporated in Colorado and has its headquarters and principal place of business in Midland, Texas. Its common shares are publicly traded on the New York Stock Exchange.

23.     Over the past several years, NGS has been the subject of repeated materially misleading or factually incorrect proxy advice from proxy advisory firms. Indeed, NGS has been forced to file supplemental proxy statements in response to this misleading proxy advice in seven of the past nine annual proxy seasons, often on unreasonably short timeframes. This process has required NGS's employees, primarily senior executives, to divert significant time and effort away from running the business in order to correct proxy firms' misleading or incorrect statements. It has also required NGS to make hard expenditures, including payments to outside consultants. The 2020 Rule would have significantly mitigated the costs imposed on NGS by the pre-Rule status quo to which the 2022 Rescission has now returned; for example, it would have decreased the costs associated with providing correct information to shareholders following a misleading proxy firm recommendation. For these reasons, NGS also provided comments on the SEC's 2021 rescission proposal, explaining the harms that it would create. *See* Comment of Natural Gas Services Group, Inc., File No. S7-17-21, Proxy Voting Advice (Dec. 27, 2022), perma.cc/T3KY-6QVB.

---

perma.cc/HY2K-83JJ; Exxon Mobil Corporation comment letter, perma.cc/D4WS-X9YJ; FedEx Corporation comment letter, perma.cc/4L3L-Z3SU; Fedex Corporation 2022 comment letter, perma.cc/LP5D-5F2A Garmin Ltd. comment letter, perma.cc/WJS6-3WRL; Kirby Corporation supplemental proxy filing, perma.cc/K5NJ-M7K9; Kirby Corporation supplemental proxy filing, perma.cc/F5LJ-YR3J; PACCAR Inc. comment letter, perma.cc/D7MQ-NCHB; Union Pacific Corporation supplemental proxy filing, perma.cc/BL3L-WNK2.

24.     Defendant United States Securities and Exchange Commission (SEC) is the federal agency charged with securities regulation.

25.     Defendant Gary Gensler is the SEC Chair. He is sued in his official capacity.

## JURISDICTION AND VENUE

26.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and this Court's inherent equitable powers.

27.     The court's jurisdiction is invoked under 28 U.S.C. § 1331, as this case arises under the laws of the United States.

28.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff NGS resides in this district, and no real property is involved in this action.

## FACTUAL ALLEGATIONS

**A.     Proxy voting advice businesses, and the SEC's obligation to regulate them.**

29.     The most important corporate governance decisions facing public companies are made at shareholder meetings—yet few shareholders vote their own shares directly. To the contrary, "today's financial markets . . . are characterized by significant intermediation and institutional investor participation," and "proxies have become the predominant means by which shareholders of publicly traded companies exercise their right to vote on corporate matters." 2020 Rule, 85 Fed. Reg. at 55,083.

30.     With the increasing importance of proxy voting, particularly by institutional investors and intermediaries, proxy advisory firms "have come to play an important role in the proxy voting process." 2020 Rule, 85 Fed. Reg. at 55,083. Such firms "typically provide investment advisers, institutional investors, and other clients with a variety of services that relate to the substance of voting decisions," including "research and analysis regarding the matters subject to a vote," promulgating "benchmark voting policies" or "specialty voting policies . . . such as a socially responsible policy," and "making specific voting recommendations to their clients on

matters subject to a shareholder vote," including "based on the proxy voting advice business's benchmark or specialty policies." *Id.* "This advice is often an important factor in the clients' proxy voting decisions." *Id.* In addition to voting policies and voting recommendations, in some instances the firms "are given authority to execute votes on behalf of their clients." *Id.*

31.     Indeed, because of the ubiquity of proxy voting and the sheer number of votes that must be taken by institutional investors and large intermediaries, proxy advisory firms "have become uniquely situated in today's market to influence, and in many cases directly execute, these investors' voting decisions." 2020 Rule, 85 Fed. Reg. at 55,083.

32.     This extraordinary level of involvement in corporate governance, however, has led to widespread concern about the practices and influence of the proxy advisory industry, "focused on the accuracy and soundness of the information and methodologies used to formulate proxy voting advice businesses' recommendations as well as potential conflicts of interest that may affect those recommendations." *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518, 66,520 (Dec. 4, 2019) (2019 Proposed Rule).

33.     As the SEC has itself explained, "in recent years concerns have been expressed by a number of commentators . . . that there could be factual errors, incompleteness, or methodological weaknesses in proxy voting advice businesses' analysis and information underlying their voting advice that could materially affect the reliability of their voting recommendations and could affect voting outcomes." 2019 Proposed Rule, 84 Fed. Reg. at 66,528. And these risks are enhanced by the lack of any preexisting requirement that proxy advisory firms give notice of their analysis to the public company in question in a way that allows the company to respond to or rebut that analysis—or that the firms make their clients aware of any such responses—so that the proxy firms' clients can make fully informed decisions on behalf of the investors whose accounts they manage. *See id.* at 66,529. Additionally, proxy advisory firms are reluctant to correct material errors in reports even once they are made aware of such inaccuracies.

34.     In 2013 and 2018, two surveys of CEOs demonstrated that nearly all respondents had "found one or more factual errors in reports prepared by proxy advisory firms about their

companies." Business Roundtable, *Comment Letter on Proposed Rule* at 11 (Nov. 9, 2018), perma.cc/46JJ-F9SR. Moreover, "[t]he 2018 survey results further indicate that although 90 percent of companies notify the proxy advisory firms of the errors, only 8 percent of companies find that the errors are consistently corrected." *Id.*

35.     Indeed, according to the NAM's own Fourth Quarter 2018 Manufacturers' Outlook Survey, nearly 78% of public company respondents were concerned about the actions of proxy advisory firms, and 56% of them found that they were having to divert resources from their core business functions in order to respond to the actions of proxy advisory firms. See *NAM Manufacturers' Outlook Survey, Fourth Quarter 2018* 8, 13 (Dec. 20, 2018), perma.cc/9CNE-HSYU.

36.     Similarly, data from 2016, 2017, and 2018 show that proxy advisory firms' reports on nearly one hundred companies included numerous factual and analytical errors. Frank M. Placenti, *Analysis of Proxy Advisor Factual and Analytical Errors in 2016, 2017, and 2018* (2018), perma.cc/RGR3-YR6X. And a more recent analysis identifies 50 instances in 2021 alone in which public companies filed supplemental proxy materials to correct a proxy firm's analysis, a 21% increase over the year before. American Council for Capital Formation, *Proxy Advisors Are Still a Problem* 9 (Dec. 2021), perma.cc/C55R-39ZX. If anything, that is, the problem is getting worse.

37.     In sum, because proxy advisory firms lack any obligation to share their reports with impacted companies or to notify their clients of any company responses to their recommendations absent the 2020 Rule, investors are often unaware of companies' efforts to correct mistakes or rebut misleading analysis, harming the mix of decision-useful information on which investors can base proxy voting decisions.

38.     Plaintiff NGS has repeatedly been the subject of inaccurate information circulated by proxy advisory firms. In 2021, for example, ISS urged shareholders to vote against the reelection of a particular director, supposedly on the basis of his lack of responsiveness to alleged concerns regarding an earlier say-on-pay proposal. But the director in question was not on the

compensation committee at the time of the action to which ISS objected, demonstrating that its advice was false and materially incomplete.

39.     This error was hardly all. In 2015, ISS stated that NGS did not disclose a compensation clawback policy. But such a provision plainly appears in the CEO's earlier-disclosed employment agreement. And similar additional errors abound. For each, NGS was obligated to spend time and resources correcting ISS's errors and providing correct information to its shareholders.

40.     NGS has repeatedly been the subject of proxy advice replete with not only objective factual errors, but also misleading, one-size-fits-all analysis that fails to appreciate the nature of NGS's business and the industry in which it operates. Specifically, ISS has frequently urged NGS's shareholders to vote against management proposals based on comparisons to ISS-selected "peer groups" that have little to nothing in common with NGS apart from their (often marginal) participation in the overall energy industry, with no regard to the particular segment of that industry in which NGS operates or the relative market capitalization of NGS and its supposed peer firms. For example, ISS deems a company called ENGlobal a peer of NGS for executive compensation purposes—despite that ENGlobal is an engineering consulting firm, with a market capitalization of $40 million, and whose CEO owns 31% of the company and receives a nominal salary, while NGS is far afield from ISS's purported peer as to every one of those characteristics.

41.     The manifest discrepancies between ISS's analysis and similar analysis using NGS's actual peer firms—which are readily identifiable—indicate that ISS is failing to provide complete and accurate information to NGS shareholders.

42.     Moreover, because ISS's voting recommendations are generally issued unreasonably close to the date of the relevant shareholder meetings, the timing of such recommendations has left NGS with little opportunity to respond. Instead, NGS's management and executives have been forced to scramble to rebut the proxy firm's misleading analysis on an unreasonably accelerated timeframe—all while shareholders are actively voting—putting the company at a distinct disadvantage in effectively communicating with its shareholders. In certain

cases, NGS has had to triage which piece of incorrect or misleading advice to respond to, as there was simply no time to rebut each of the proxy firm's mistaken recommendations.

43.    ISS also evaluates companies' profitability using a proprietary, black-box metric called Economic Value Added (EVA), rather than Generally Accepted Accounting Principles (GAAP) measures or other commonly used metrics, such as EBITDA, that are available to the companies themselves. This non-standard, non-transparent evaluation procedure both increases the difficulties for companies attempting to respond to ISS's analysis on an already tight timeframe, and also ratchets up the pressure, discussed below, for companies to retain ISS's consulting arm. It further leads to enhanced risk of inaccurate or misleading information being provided to shareholders.

44.    These concerns regarding proxy advisory firms are heightened by the significant conflicts of interests under which these entities operate. As the SEC has previously explained, "[p]roxy voting advice businesses engage in activities or have relationships that could affect the objectivity or reliability of their advice, which may need to be disclosed in order for their clients to assess the impact and materiality of any actual or potential conflicts of interest with respect to a voting recommendation." 2019 Proposed Rule, 84 Fed. Reg. at 66,525.

45.    For example, ISS sells corporate governance consulting services to the very same companies about which it makes proxy voting recommendations on the basis of its governance policies. Plaintiff NGS itself has received repeated solicitations and marketing materials from ISS's corporate governance consulting arm, even as ISS has consistently issued negative recommendations on NGS's shareholder-voting proposals. The Government Accountability Office has also explained that ISS's business model is likely to present precisely these sorts of conflicts. U.S. Gov't Accountability Off., GAO-07-765, *Corporate Shareholder Meetings: Issues Relating to Firms that Advise Institutional Investors on Proxy Voting* at 4 (2007), perma.cc/YTF3-ZX5Z.

46.    Proxy advisory firms also engage in electronic voting practices commonly referred to as "robo-voting." *See* Richard Levick, *'Vinny' and the Proxy Advisors: A Five Trillion Dollar*

*Debate*, Forbes.com (Dec. 17, 2018), perma.cc/J388-5CR5. While voters can manually opt out, proxy advisory firms establish default voting behaviors and automatically submit shareholder votes without the voter taking any action whatsoever to confirm, approve, or submit votes. *See* Letter from the National Investor Relations Institute to Jay Clayton, Chair, U.S. Securities and Exchange Commission (Aug. 3, 2017), perma.cc/U6QV-JY4E; *see also* Timothy M. Doyle, *The Realities of Robo-Voting*, Am. Council for Capital Formation (Nov. 2018), perma.cc/H9T4-Y9PV. In addition to the self-evident procedural problems with casting votes through default procedures, robo-voting deprives investors of the chance to review company responses and rebuttals before votes are cast, thus compounding any potential proxy firm conflicts or inaccuracies by translating their recommendations directly into voting power.

47.    The Exchange Act obligates the SEC to comprehensively regulate the public securities markets. Congress was especially concerned with the solicitation of proxies, seeking to ensure that proxy solicitations involve accurate and transparent information. Section 14(a) of the Exchange Act makes it unlawful for any person to "solicit . . . any proxy or consent or authorization" with respect to publicly traded securities "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78n(a)(1). At the time of the statute's enactment, the word "solicit" ordinarily meant both (1) to "endeavor to obtain" an action, and (2) to "awake or excite to action." Black's Law Dictionary 1639 (3d ed. 1933). Given that proxy advisory firms endeavor to obtain votes in accord with its recommendations—indeed, they often submit their clients' votes pursuant to their own advice—they fall squarely within the scope of what Congress sought to govern. The SEC, accordingly, is *obligated* to regulate proxy advisory firms. Indeed, as the SEC described in separate litigation, "[t]he Commission has long considered proxy voting advice to generally constitute a 'solicitation' within the meaning of Section 14(a)" Cross-Mot. for S.J., *ISS v. SEC*, at 6, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1.

B.     **The SEC engages in a decade-long bipartisan policymaking process, culminating in the 2020 Rule.**

48.     Particularly "[g]iven proxy voting advice businesses' potential to influence the voting decisions of investment advisers and other institutional investors, who often vote on behalf of others," the SEC over time became "concerned about the risk of proxy advice businesses providing inaccurate or incomplete voting advice (including the failure to disclose material conflicts of interest) that could be relied upon to the detriment of investors." 2019 Proposed Rule, 84 Fed. Reg. at 66,520. As the SEC has described, proxy voting advice is now "widely used," is "typically delivered shortly before the shareholder meeting," and "is often an important factor in shareholder voting decisions that can sway outcomes." Cross-Mot. for S.J., *ISS v. SEC*, at 2, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1. Moreover, "as institutional investors have come to hold a significant and increasing number of shares, proxy voting advice businesses have become uniquely situated to influence, and in many cases directly execute, these investors' voting decisions." *Id*. at 15. The SEC thus took action "in response to these market developments." *Id*. at 2.

49.     The SEC's bipartisan concern with the outsized and unregulated role of proxy advisory firms began as early as 2010. That year, under Chair Mary Schapiro, the SEC's Concept Release on the U.S. Proxy System identified conflicts of interest and a lack of accuracy and transparency as key concerns related to proxy advisory firms. *See* 75 Fed. Reg. 42,982 (July 22, 2010). Specifically, the release noted concerns that "voting recommendations by proxy advisory firms may be made based on materially inaccurate or incomplete data," and that "the analysis provided to an institutional client may be materially inaccurate or incomplete." *Id.* at 42,982. It also noted risks that proxy firms "may base their recommendation on [a] one-size-fits-all governance approach." *Id* at 43,012. And the release acknowledged that companies often wish to engage with proxy firms to address these issues, but that the firms "may be unwilling, as a matter of policy, to accept any attempted communication from the issuer or to reconsider

recommendations in light of such communications" when companies seek to correct mistakes or misleading statements. *Id.*

50.     The 2010 release also noted potential regulatory solutions. It acknowledged that market participants felt that "additional oversight mechanisms could improve the likelihood that voting recommendations are based on materially accurate and complete information," and, specifically, that "issuers have expressed a desire to be involved in reviewing a draft of the proxy advisory firm's report, if only for the limited purpose of ensuring that the voting recommendations are based on accurate issuer data." 75 Fed. Reg. at 43,012. The release thus contemplated regulatory solutions including disclosures about proxy firms' internal accuracy controls and research capabilities, information on the firms' processes to interact with issuers and address issuer appeals, and a requirement that proxy firms publicly file their voting recommendations with the SEC. *Id.* at 43,013.

51.     The SEC's policymaking process with respect to regulation of proxy advisory firms continued throughout the intervening years. In 2013, under Chair Mary Jo White, the agency held a Roundtable on Proxy Advisory Services, at which participants discussed "the current use of proxy advisory services" and "the transparency and accuracy of recommendations by proxy advisory firms." *See* Press Release, *SEC Announces Agenda, Panelists for Roundtable on Proxy Advisory Services* (Nov. 27, 2013), perma.cc/UE9F-KZRZ. And in 2018 under Chair Jay Clayton, the SEC held a Roundtable on the Proxy Process, with panelists discussing "[w]hether issuers are being given an appropriate opportunity to raise concerns if they disagree with a proxy advisory firm's recommendations, including, in particular, if the recommendation is based on erroneous, materially incomplete, or outdated information," along with "[t]he appropriate regulatory regime for proxy advisory firms." *See* Chair Jay Clayton, *Statement Announcing SEC Staff Roundtable on the Proxy Process* (July 30, 2018), perma.cc/2D93-VGR4.

52.     That decade-long policymaking process began to bear fruit in December 2019, when the SEC issued a notice of proposed rulemaking proposing new regulations to govern proxy advisory firms. *See* 2019 Proposed Rule, 84 Fed. Reg. 66,518. Specifically, the agency proposed

to amend its regulations "to help ensure that investors who use proxy voting advice receive more accurate, transparent, and complete information on which to make their voting decisions, in a manner that does not impose undue costs or delays that could adversely affect the timely provision of proxy voting advice" (*id.* at 66,518), in three principal ways:

53.     *First*, the 2019 Proposed Rule proposed "to codify the Commission's interpretation that proxy voting advice generally constitutes a solicitation within the meaning of the Securities Exchange Act of 1934." 2019 Proposed Rule, 84 Fed. Reg. at 66,518.

54.     *Second*, recognizing that proxy advisory firms utilize exemptions from the various regulatory requirements imposed on proxy solicitations, the 2019 Proposed Rule "propos[ed] new conditions to [those] exemptions . . . that would apply specifically to persons furnishing proxy voting advice." 2019 Proposed Rule, 84 Fed. Reg. at 66,525. The agency proposed two categories of conditions.

55.     For one, the SEC would require proxy advisory firms wishing to be exempt from the requirements for solicitations to "include in [their proxy voting] advice" several conflict-of-interest disclosures "tailored to proxy voting advice businesses and the nature of their conflicts." 2019 Proposed Rule, 84 Fed. Reg. at 66,526.

56.     Additionally, the SEC proposed a robust issuer-engagement requirement, which would have "require[d], as one of the conditions to the exemptions . . . the proxy voting advice business [to] provide registrants . . . a limited amount of time to review and provide feedback on the advice before it is disseminated to the business's clients." 2019 Proposed Rule, 84 Fed. Reg. at 66,531. As the SEC explained at the time, "[w]e believe that establishing a process that allows registrants . . . a meaningful opportunity to review proxy voting advice in advance of its publication and provide their corrections or responses would reduce the likelihood of errors, provide more complete information for assessing proxy voting advice businesses' recommendations, and ultimately improve the reliability of the voting advice utilized by investment advisers and others who make voting determinations, to the ultimate benefit of investors." *Id.* at 66,530; *see also id.* at 66,528-66,530 (discussing the need for this provision).

57.     *Third*, the 2019 Proposed Rule proposed to "amend the proxy rules to clarify when the failure to disclose certain information in proxy voting advice may be considered misleading within the meaning of the rule"—thereby exposing the proxy firm to potential fraud liability—"depending upon the particular facts and circumstances at issue." 2019 Proposed Rule, 84 Fed. Reg. at 66,518.

58.     The NAM supported the 2019 Proposed Rule as originally proposed, including its robust requirement for pre-publication notice and review by companies of proxy firms' analysis, and in fact advocated for even stronger protections. *See* Comment of the National Association of Manufacturers, File No. S7-22-19, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, *supra*, at 10-11, 14-15 (explaining that these procedures "would reduce the likelihood of errors, provide investors with more complete information, and improve the reliability of proxy voting advice," without "imped[ing] the proxy firms' ability to meet the deadlines of proxy season" or "threaten[ing]" "the proxy advisory firms' independence"); *id.* at 12 (advocating for enhancement to the 2019 proposal that would have required proxy firms to include the full text of an issuer's dissenting opinion alongside the firm's analysis).

59.     After a thorough notice and comment process, the SEC issued a final rule in 2020 that retained some features of the 2019 Proposed Rule, but substantially compromised other aspects. *See generally Exemptions From the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) ("2020 Rule").

60.     Specifically, the 2020 Rule finalized the proposals to (1) codify the SEC's interpretation that proxy advice is a solicitation subject to the proxy rules; (2) require proxy firms to disclose conflicts of interests in order to be exempt from certain requirements applicable to proxy solicitations; and (3) add Note (e) to the SEC's existing anti-fraud rule, Rule 14a-9, providing that proxy firms' failure to disclose certain material information may be considered false or misleading, depending on the facts and circumstances. *See* 2020 Rule, 85 Fed. Reg. at 55,082, 55,154-55155.

61.    As to the issuer-engagement provision, however, the 2020 Rule as adopted was much less stringent than the 2019 proposal. In response to "concerns raised by commenters regarding the potential unintended consequences" of the 2019 framework, "including those related to timing and the risk of affecting the independence of the [proxy voting] advice" (2020 Rule, 85 Fed. Reg. at 55,112), the SEC materially softened its approach, weakening the safeguards that had been proposed. *See* 2022 Rescission, 87 Fed. Reg. at 43,170 n.26 (noting that "[t]he Commission adopted the [2020 issuer-engagement] conditions, in part, in response to the concerns expressed by commenters about the 'advance review and feedback' conditions that were included in the Commission's 2019 proposed rules"); *id.* ("In response to these comments, the Commission reconsidered its approach and, in the 2020 Final Rules, adopted the Rule 14a-2(b)(9)(ii) conditions in place of the advance review and feedback conditions.").

62.    In particular, rather than require pre-publication disclosure of proxy advice to issuers and an opportunity for pre-publication feedback, the 2020 Rule as adopted merely required proxy firms to adopt "policies and procedures reasonably designed to ensure that: (A) Registrants that are the subject of the proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the proxy voting advice business's clients; and (B) The proxy voting advice business provides its clients with a mechanism by which they can reasonably be expected to become aware of any written statements regarding its proxy voting advice by registrants who are the subject of such advice, in a timely manner before the security holder meeting." *Id.* at 55,154, *see* 17 C.F.R. § 240.14a-2(b)(9)(ii).

63.    That is, the issuer-engagement provision as adopted by the 2020 Rule simply required proxy firms to (a) disclose their proxy voting advice to the public companies that are the subject of the advice; and (b) provide their clients a mechanism through which they can become aware when a company responds to the firm's analysis.

64.    As the SEC explained at the time, "[b]ecause Rule 14a-2(b)(9)(ii)"—that is, the issuer-engagement provision as adopted—"does not require proxy voting advice businesses to adopt policies that would provide registrants with the opportunity to review and provide feedback

on their proxy voting advice before such advice is disseminated to clients, the rule *does not create the risk that such advice would be delayed or that the independence thereof would be tainted* as a result of a registrant's pre-dissemination involvement." 2020 Rule, 85 Fed. Reg. at 55,112 (emphasis added).

65.     In sum, the 2020 Rule represented a compromise between the position of advocates for robust regulation of proxy advisory firms, and the resistance to those reforms by the proxy advisory firms themselves. And while the NAM advocated strongly for the protections embodied in the 2019 proposal, it accepted and supported the 2020 Rule's compromise position as meaningful incremental progress. *See* Comment of the National Association of Manufacturers, File No. S7-17-21, Proxy Voting Advice, *supra*, at 9 ("Though less robust than either the 2019 proposal or the NAM's preferred approach to issuer-proxy firm engagement, the NAM nevertheless strongly supported, and continues to support, the reforms included in the 2020 final rule.").

66.     The same day that it finalized the 2020 Rule, the SEC also issued a supplemental guidance document "to assist investment advisers in assessing how to consider the additional information that may become more readily available to them as a result of [the 2020 Rule], including in circumstances where the investment adviser utilizes a proxy advisory firm's electronic vote management system that 'pre-populates' the adviser's proxies with suggested voting recommendations and/or for voting execution services." *Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 85 Fed. Reg. 55,155, 55,155 (Sept. 3, 2020). The supplemental guidance also communicated the SEC's view regarding what disclosures may be required by an investment adviser that utilizes a proxy advisory firm's robo-voting services. *Id.* at 55,156-55,157.

## C.    The SEC suspends and rescinds the 2020 Rule.

67.     The proxy advisory industry responded adversely and aggressively to even the modest efforts to enhance accuracy and transparency embodied in the 2020 Rule. In addition to a

full-court-press lobbying campaign, ISS, one of the largest proxy advisory firms, sued the SEC, seeking to set aside the Rule. *See generally Institutional Shareholder Services Inc. v. SEC*, No. 19-cv-3275 (D.D.C.).[2]

68.     The SEC under its new Chair, defendant Gary Gensler, thus began an abrupt about-face in June 2021, undoing the result of a decade of bipartisan policymaking. These actions were accompanied by a closed-door meeting involving the 2020 Rule's opponents. *See* 2021 Proposed Rescission, 86 Fed. Reg. at 67,385-67,386 & n.24 (admitting that "Chair Gensler and members of the Commission staff" met with opponents of the 2020 Rule "on June 11, 2021" so that those organizations could "express[] general opposition to the 2020 Final Rules, including with respect to the [issuer-engagement] provisions").

69.     First, Chair Gensler "direct[ed] [SEC] staff to . . . consider whether to recommend that the Commission revisit" the 2020 Rule, and the agency the same day stated that it would not enforce the 2020 Rule "during the period in which the Commission is considering further regulatory action in this area." Gary Gensler, SEC Chair, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021), perma.cc/AZK5-6LND; SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rules 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021), perma.cc/GH2B-YSJ4. And SEC attorneys later confirmed in litigation that these actions affirmatively "provide[d] . . . proxy voting advice businesses[] relief" from having to comply with the 2020 Rule. Mtn. for Abeyance, *Institutional Shareholder Services Inc. v. SEC*, No. 19-cv-3275 (D.D.C. June 1, 2021), Dkt. 53, at 4.

---

[2]     Because of its compelling interests in this area, the NAM moved for intervenor status in that litigation, which was then stayed pending the SEC's rescission rulemaking. Following that rulemaking, proceedings in the *ISS* litigation have now resumed.

70.     In other words, the SEC effectively suspended the compliance requirement for the 2020 Rule, before it had even come into effect. As a result, proxy advisory firms did not comply with the 2020 Rule's regulatory requirements during the Spring 2022 proxy season.[3]

71.     Second, the SEC issued a proposed rule on November 21, 2021, proposing to rescind important aspects of the 2020 Rule. *See Proxy Voting Advice*, 86 Fed. Reg. 67,383 (Nov. 26, 2021) ("2021 Proposed Rescission"). The SEC finalized that proposal on July 19, 2022, by a divided 3-2 vote of the five Commissioners. *See* 2022 Rescission, 87 Fed. Reg. 43,168; *but see* Commissioner Hester M. Peirce, *U-Turn: Comments on Proxy Voting Advice* (July 13, 2022) (dissenting), perma.cc/7BMX-GMA7; Commissioner Mark T. Uyeda, *Statement on Final Rule Amendments on Proxy Voting Advice* (July 13, 2022) (dissenting), perma.cc/TS3H-FH6K.

72.     Specifically, the 2022 Rescission rescinds both the 2020 Rule's compromise issuer-engagement provision, and the 2020 Rule's explanatory Note (e) to the anti-fraud rule. No replacement provisions were promulgated; the 2022 Rescission simply deletes these provisions from the Code of Federal Regulations.

73.     As to issuer engagement, the agency provided no new facts or analysis to support its reversal of position (indeed, it could not provide practical analysis of the 2020 Rule's impacts, since it had never allowed that Rule to go into effect). Instead, it offered essentially two justifications for discarding the protections that had emerged from its prior, deliberative policymaking process:

74.     *First*, the SEC noted that "many investors and [proxy advisory firm] clients have continued to warn, both in response to the adoption of the 2020 [Rule] and again in comments on the 2021 [Proposed Rescission], that the Rule 14a-2(b)(9)(ii) conditions risk impairing the

---

[3]   This suspension of the 2020 Rule's requirements, which occurred without observance of the APA's notice-and-comment procedures, was unlawful, and the NAM and NGS sued in this Court to set that illegal agency action aside. *NAM v. SEC*, No. 7:21-cv-183-DC-RCG (W.D. Tex. filed Oct. 13, 2021); *see, e.g.*, *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113 (2d Cir. 2018) (the APA's notice and comment requirements "apply with the same force when an agency seeks to delay . . . a previously promulgated final rule.").

independence and timeliness of proxy voting advice and imposing increased compliance costs on [proxy firms], without corresponding investor protection benefits." 2022 Rescission, 87 Fed. Reg. at 43,175. That is, regulated parties continued to express the same opposition that the SEC had considered and rejected in adopting the 2020 Rule in the first place. *See also* Commissioner Hester M. Peirce, *U-Turn: Comments on Proxy Voting Advice*, *supra* (explaining that the comment letters received "in support of the Redo Proposal . . . did not include new information to justify the Commission's U-Turn. Instead, they reiterated concerns that commenters had raised during the prior rulemaking process."). And, without explaining how the 2020 Rule's provisions could possibly affect "the independence and timeliness of proxy voting advice" (*see* ¶ 64, *supra*), the agency contradicted its express statement to the contrary in the 2020 Rule and "agree[d] that the risks posed by the Rule 14a-2(b)(9)(ii) conditions to the cost, timeliness, and independence of proxy voting advice are sufficiently significant such that it is appropriate to rescind the conditions now." 2022 Rescission, 87 Fed. Reg. at 43,175.

75. *Second*, the SEC stated its "belie[f] that any negative effects of rescinding the Rule 14a-2(b)(9)(ii) conditions will be mitigated, to some extent, by existing mechanisms in the proxy system that advance some of the same goals" (2022 Rescission, 87 Fed. Reg. at 43,176), citing back to the 2021 Proposed Rescission, which had cataloged voluntary practices by one leading proxy advisory firm that parallel *some* of the 2020 Rule's issuer-engagement provisions. *Id.*; *see* 2021 Proposed Rescission, 86 Fed. Reg. at 67,386-67,387 (discussing voluntary practices of proxy firms, predominantly Glass Lewis).

76. Separately, as to the rescission of the 2020 Rule's explanatory Note (e) regarding the applicability of the SEC's anti-fraud rule to proxy advisory firms, the Commission cited an alleged "risk of confusion regarding the application of Rule 14a-9 [that is, the anti-fraud rule] to proxy voting advice." 2022 Rescission, 87 Fed. Reg. at 43,181. But in rescinding the note, the Commission bizarrely reiterated the substance of the note verbatim. *Compare* 17 C.F.R. § 240.14a-9 (2021) (explanatory note) ("The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section. . . . e.

Failure to disclose material information regarding proxy voting advice . . . such as the proxy voting advice business's methodology, sources of information, or conflicts of interest."), *with* 2022 Rescission, 87 Fed. Reg. at 43,180 (reiterating, in the course of rescinding this note, that "a [proxy advisory firm] may, depending on the facts and circumstances, be subject to liability under Rule 14a-9 for . . . an omission of material fact from[] its proxy voting advice, including with regard to its methodology, sources of information, or conflicts of interest.").

>    **D.    The 2022 Rescission is arbitrary and capricious as well as procedurally defective.**

77.    The 2022 Rescission is arbitrary and capricious, and must be set aside, for at least the following reasons:

78.    *First*, the Commission has abruptly changed course and rescinded a regulation based upon essentially the same factual record that it had used to justify promulgating that regulation in the first place, without adequately justifying the changed result. Indeed, the factual record is necessarily the same, because the SEC never let the 2020 Rule take effect and be fairly evaluated in practice. As the Supreme Court has explained, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

79.    That is exactly the case here, where the principal basis for the SEC's decision—"concerns" about the effect of the 2020 Rule's issuer-engagement provisions on "the independence and timeliness of proxy voting advice" (2022 Rescission, 87 Fed. Reg. at 43,175)—is one that the SEC explicitly found to be baseless in adopting the 2020 Rule just two years ago. *See* 2020 Rule, 85 Fed. Reg. at 55,112 ("Because [the 2020 Rule] does not require proxy voting advice businesses to adopt policies that would provide registrants with the opportunity to review and provide feedback on their proxy voting advice before such advice is disseminated to clients, the rule *does not create the risk that such advice would be delayed or that the independence thereof would be tainted* as a result of a registrant's pre-dissemination involvement.") (emphasis added); *see also*

Commissioner Hester M. Peirce, *U-Turn: Comments on Proxy Voting Advice*, *supra* (explaining that the "concerns" expressed in comments supporting the 2022 Rescission were merely "reiterated" from "the prior rulemaking process").

80.     The SEC has provided no explanation for why that explicit 2020 finding was wrong, or how simply providing issuers with proxy reports *after they are finalized*, and providing a means for clients to become aware of any issuer responses to those finalized reports, could possibly affect "the independence and timeliness of proxy voting advice." 2022 Rescission, 87 Fed. Reg. at 43,175.

81.     *Second*, that failure to explain the central basis for the SEC's decision is fatal under the APA, even ignoring that it represents a 180-degree change in position. An agency's most fundamental responsibility in issuing a rule is to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). But the SEC here has articulated *no* explanation for the very cornerstone of its action: the notion that the 2020 Rule's issuer-engagement provisions somehow risk undermining the "independence and timeliness of proxy voting advice." 2022 Rescission, 87 Fed. Reg. at 43,175.

82.     To the contrary, the 2022 Rescission simply repeats, with no further explanation, that "concerns" about timeliness and independence have been voiced by the 2020 Rule's opponents (*see, e.g.*, 2022 Rescission, 87 Fed. Reg. at 43,175); nowhere does it explain *why* a requirement that proxy advice be provided to registrants contemporaneously with the proxy firm's clients, and that those clients be made aware of a registrant's response, would affect the timeliness or independence of proxy advice. Nor could it: As the NAM explained in its comment letter, "[i]t is implausible that a [proxy firm]'s ability to publish independent, unbiased voting advice could be impacted by a requirement that it send its voting recommendations to businesses *after they are finalized*"; instead, these "concerns" are merely recycled from the 2019 Proposed Rule, which would have required consultation with businesses on proxy firms' *draft* reports regarding those

businesses. Comment of the National Association of Manufacturers 12, File No. S7-17-21, Proxy Voting Advice (Dec. 24, 2022), perma.cc/FT3P-JWFB. That is, while the NAM does not believe that even the 2019 Proposed Rule would have harmed the independence or timeliness of proxy voting advice, these concerns at least made arguable sense in that context. Here, where the 2020 Rule requires a proxy advisory firm to take action only *after* its recommendations are finalized and disseminated, they do not. This failure of the SEC to "articulate . . . a 'rational connection between the facts found and the choice made'" is fatal to the 2022 Recission. *State Farm*, 463 U.S. at 43.

83.     The SEC has similarly failed with respect to the second pillar of its reasoning for rescinding the 2020 Rule: the idea that voluntary measures by proxy firms may approximate some of the mechanisms that the Rule would have required, thereby (the agency says) rendering those mechanisms unnecessary. *See* 2022 Rescission, 87 Fed. Reg. at 43,176.

84.     To start with, it is arbitrary and capricious for an agency to find that a party's voluntary conduct obviates the need for regulatory actions necessary to protect issuers. Current practice by proxy advisory firms offers no guarantee about their future behavior, nor does it address new market entrants.  And it is especially irrational for SEC to assert, on the one hand, that the 2020 issuer-engagement provisions would hinder timeliness or independence, while at the same time suggesting such measures are unnecessary because of proxy advisory firm's own voluntary behavior. This too is irrational decision-making.

85.     Moreover, the agency's reasoning on this point relies heavily on the voluntary engagement measures of Glass Lewis, one pole of what the SEC notes is a "duopoly" in the proxy advice industry. 2021 Proposed Rescission, 86 Fed. Reg. at 67,386; *see* 2022 Rescission, 87 Fed. Reg at 43-183-43,184 n.259 (quoting a third-party report to the effect that "today the market is essentially a duopoly consisting of Institutional Shareholder Services and Glass Lewis & Co.") (ellipses omitted). But as for ISS—the other pole of the duopoly, which by many metrics is significantly larger than Glass Lewis (*see, e.g.*, 2022 Rescission, 87 Fed. Reg. at 43,183)—the SEC could only muster that ISS "can . . . *choose to* engage with registrants during the process of formulating its proxy voting advice," and had to acknowledge that "although ISS provides a copy

of its proxy voting advice to registrants for free [after publication], it does not allow registrants to share that advice with any external parties, *including its attorneys, proxy solicitors and compensation consultants*," which "may inhibit a registrant's ability to respond to ISS's proxy voting advice in a manner that would benefit its shareholders." 2021 Proposed Rescission, 86 Fed. Reg. at 67,387, 67,388 n.59 (emphases added). And, in practice, ISS is resistant to meaningful engagement with issuers—in fact, ISS *rescinded* its previous issuer-engagement program for companies in the S&P 500 in response to the SEC finalizing the 2020 Rule. 2021 Proposed Rescission, 86 Fed. Reg. at 67,387 n.48 (quoting ISS FAQ document stating that "[i]n the U.S., as from January 2021, drafts are no longer provided to U.S. companies including those in the S&P500 index.")

86.     What is more, the agency previously found that "the existing voluntary forms of outreach to registrants and other market participants" by proxy firms are *not* "alone sufficient" (2020 Rule, 85 Fed. Reg. at 55,108)—and the only policy that has changed since that finding is that ISS *stopped* providing any U.S. companies an opportunity to review proxy advice before it is published. *See* 2021 Proposed Rescission, 86 Fed. Reg. at 67,387 ("Notably, ISS does not provide draft proxy voting advice to any United States registrants."); *id.* at 67,387 n.48. Thus, U.S. issuers actually now benefit from *fewer* engagement opportunities than they did when the 2020 Rule was finalized—further undermining the SEC's 2022 claims that the Rule's issuer-engagement provisions are now unnecessary.

87.     Despite acknowledging these shortcomings of ISS's issuer-engagement policies, the SEC in its 2022 Rescission touts the supposed "fact that the leading [proxy firms] have voluntarily adopted practices that provide their clients and registrants with some of the opportunities and access to information that would have been required by" the 2020 Rule as reason to think that rescinding the Rule will do no harm. 2022 Rescission, 87 Fed. Reg. at 43,176. But by failing to address the deficiencies in the *largest* proxy advisory firm's issuer-engagement practices, and relying instead on those of the second-largest, the agency has "entirely failed to consider an

important aspect of the problem," making its decision arbitrary and capricious. *State Farm*, 463 U.S. at 43.

88.     *Third*, and relatedly, the SEC has failed to respond adequately to comments received during rulemaking. Comments from the NAM, NGS, and others challenged the fundamental justifications for the SEC's rescission—including the idea that contemporaneous notice of proxy advice and a response mechanism would somehow impinge upon timeliness and independence of proxy advice, and the false notion that proxy advisory firms like ISS are, factually, open to meaningful engagement with issuers that could approximate the 2020 Rule's issuer-engagement provisions—and the agency did not meaningfully respond, instead simply repeating the premises that the comments had rebutted. That renders its action arbitrary and capricious. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."); *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (agency "must respond to comments that can be thought to challenge a fundamental premise underlying the proposed agency decision.") (quotation marks omitted).

89.     *Fourth*, the SEC has also "failed to consider" other "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. To take just one example, the SEC in promulgating the 2020 Rule found it critical that, "given the high incidence of voting that takes place very shortly after a proxy voting advice business's advice is distributed to its clients, without a mechanism by which clients can reasonably be expected to become aware of any response in a timely manner (as they and other investors would if the discussion were taking place at a meeting where shareholders are physically attending and participating), votes may be cast on less complete information." 2020 Rule, 85 Fed. Reg. at 55,108. Yet the agency has not indicated any consideration of this important aspect of the issue in rescinding the very regulations that were adopted to remedy it.

90.     *Fifth*, the SEC's rescission of Note (e) to Rule 14a-9 is irrational, and therefore arbitrary and capricious. As noted above (*see* ¶ 76, *supra*), the agency deleted the Note in order to address a supposed "risk of confusing regarding the application of Rule 14a-9 to proxy voting

advice" (2022 Rescission, 87 Fed. Reg. at 43,181), but then repeated the substance of the deleted note, nearly verbatim, in its explanation of its understanding of current law. *See id.* at 43,180. It is hard to understand how deleting a sentence from the Code of Federal Regulations, but repeating it in the Federal Register, does anything to address any supposed "confusion." Indeed, as one of the dissenting Commissioners explained, "the deletion of Note (e) *fails* to provide regulatory clarity," and instead sows even further confusion. Commissioner Mark T. Uyeda, *Statement on Final Rule Amendments on Proxy Voting Advice*, *supra* (emphasis added).

91.     Moreover, the agency appears not to have meaningfully considered obvious reasonable alternatives, such as leaving the Note to Rule 14a-9 and simply issuing the same clarifying statement that appears in the 2022 Rescission, since it is the agency's position is that the rescission "is not intended to, and does not, affect the scope of Rule 14a-9 or its application to proxy voting advice, just as the adoption of Note (e) in the 2020 [Rule] was not intended to, and did not, affect the scope of Rule 14a-9 or its application to proxy voting advice." 2022 Rescission, 87 Fed. Reg. at 43,180; *see, e.g.*, *Wages & White Lion Invs., LLC v. FDA*, 46 F.4th 1130, 1139 (5th Cir. 2021) ("When an agency rescinds or alters a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing policy.") (quoting *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)) (alteration incorporated; emphasis omitted).

92.     *Sixth*, the SEC's retraction, in the 2022 Rescission, of an agency guidance document regarding investment advisers' proxy voting responsibilities, including with respect to investment advisers' review of issuer responses provided pursuant to the 2020 Rule and their use of proxy firms' robo-voting services, should also be set aside. *See Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 85 Fed. Reg. 55,155 (Sept. 3, 2020) (supplemental guidance); 2022 Rescission, 87 Fed. Reg. at 43,178 (rescinding the supplemental guidance). The decision to rescind the guidance was based on the agency's simultaneous rescission of the 2020 Rule's issuer-engagement provisions. *See id.* at 43,178 & n.161 (rescinding the "Supplemental Proxy Voting Guidance," which "addressed situations in which advisers use a [proxy advisory firm's] electronic vote management system and related

disclosure obligations, as well as client consent relating to the use of automated voting services," in light of comments "indicat[ing] that because the [guidance] was tied to the 2020 Final Rules, any rescission of those rules should also include the [guidance]"). If the Court sets aside the SEC's rescission of the 2020 Rule's issuer-engagement provisions—which it should do—it should therefore also set aside the rescission of the supplemental guidance.

93.     Moreover, the 2022 Rescission was effected without full observance of the APA's notice and comment procedures, and the entire rulemaking must be set aside on that basis as well. *See* 5 U.S.C. § 706(2)(D). As the D.C. Circuit has explained, "the opportunity for comment" mandated by the APA "must be a meaningful opportunity," and "in order to satisfy this requirement an agency must also remain sufficiently open-minded." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) (citation omitted).

94.     That requisite open-mindedness to opposing views is absent here; to the contrary, all signs indicate that Chair Gensler's SEC had made up its mind to rescind the 2020 Rule before even initiating the notice and comment process. As we have described, the SEC unlawfully suspended the 2020 Rule on the same day that it announced it was "revisit[ing]" that rule (Gensler, *Statement on the Application of the Proxy Rules*, *supra*), indicating that the agency never intended to allow the 2020 Rule to take effect. *See* ¶ 70 & n.4, *supra*. And the SEC then began that reconsideration process *not* by taking public comments, but by holding a secret, behind-closed-doors meeting with only *opponents* of the 2020 Rule, again biasing the agency against a good-faith consideration of comments from both sides. *See* 2021 Proposed Rescission, 86 Fed. Reg. at 67,385-67,386 & n.24 (admitting that "Chair Gensler and members of the Commission staff" met with opponents of the 2020 Rule "on June 11, 2021"—only 10 days after the SEC suspended the 2020 Rule—so that those organizations could "express[] general opposition to the 2020 Final Rules, including with respect to the [issuer-engagement] provisions").

95.     The SEC's failure to provide a meaningful opportunity to comment is also betrayed by the unduly short comment period allowed by the 2021 Proposed Rescission. The standard comment period for a significant rulemaking is 60 days at minimum, but the SEC allowed only a

31-day comment period for the 2022 Rescission—and it set the comment deadline on December 27, 2021, directly in the middle of the holiday season, when many commenters' personnel would foreseeably be unavailable. 2021 Proposed Rescission, 86 Fed. Reg. at 67,383; *see also* Commissioner Mark T. Uyeda, *Statement on Final Rule Amendments on Proxy Voting Advice*, *supra* (explaining that "the 30-day comment period for the proposal was insufficient under the circumstances," given the complexity of the issues, the longer comment period allowed for the 2020 Rule's original adoption, and the placement of the accelerated comment deadline within the holiday and end-of-fiscal-year season).

96.    Indeed, the insufficiency of the holiday comment period for the 2022 Rescission is apparent from the tiny relative number of comments actually received by the SEC during that period: less than *one tenth* of the comments received during the rulemaking that led to the adoption of the 2020 Rule in the first place. *Compare* SEC, *Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, File No. S7-22-19 (667 comments on 2019 Proposed Rule), perma.cc/29HH-26TS, *with* SEC, *Comments on Proposed Rule: Proxy Voting Advice*, File No. S7-17-21 (61 comments on 2021 Proposed Rescission), perma.cc/MB78-6CKQ. It appears that—as was fully predictable—many entities and individuals concerned with these issues were unable to submit comment letters on a compressed timeframe, over the holidays.

97.    Senators have also criticized the SEC for the shortened comment period allowed for the 2022 Rescission, particularly in light of Chair Gensler's public assurances, in testimony before a Congressional subcommittee, that comment periods would "always" be at least two months. Letter from Sens. Bill Hagerty & Thom Tillis to Chair Gary Gensler (July 12, 2022), perma.cc/7WT2-HMWT; *see* House Appropriations Committee, *Fiscal Year 2023 Budget Request for the Federal Trade Commission and the Securities and Exchange Commission* (May 18, 2022), https://perma.cc/UM6V-PUDR (video at 54:53-55:50).

98.    Particularly given that enforcement of the 2020 Rule was suspended at the time, there was simply no reason for this headlong rush to rescind the rule; instead, the abbreviated comment period indicates a lack of good-faith consideration by the agency. Indeed, courts have

set aside agency action for such deficient comment periods, and this Court should do the same here. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117-1118 (D.C. Cir. 2019) ("When substantial rule changes are proposed, a 30-day comment period is generally the *shortest* time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment.") (emphasis added); *California v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1176-1178 (N.D. Cal. 2019) (finding 30-day comment period for repeal of rule insufficient, where adoption of the rule had followed a 120-day comment period). Procedurally as well as substantively, the 2022 Rescission is fatally flawed.

## CLAIMS FOR RELIEF

### Count I
### Administrative Procedure Act – unlawfully arbitrary and capricious agency action

99.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

100.    The Administrative Procedure Act empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

101.    The 2022 Rescission violates these APA requirements. It fails to "articulate . . . a 'rational connection between the facts found and the choice made'"; it "fail[s] to consider . . . important aspect[s] of the problem"; and it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It also fails to "consider and respond to significant comments" (*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)), and rescinds an existing policy without "consider[ing] the alternatives that are within the ambit of the existing policy" (*Wages & White Lion Invs., LLC v. FDA*, 46 F.4th 1130, 1139 (5th Cir. 2021)).

102.    The 2022 Rescission must therefore be set aside. 5 U.S.C. § 706(2).

**Count II**
**Administrative Procedure Act – failure to follow notice and comment procedures**

103.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

104.    The Administrative Procedure Act empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). And those required procedures include "an opportunity" for interested persons "to participate in the rule making through submission of written data, views, or arguments" (*id.* § 553(c)), which opportunity must be "meaningful" in order to suffice (*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)).

105.    The 2022 Rescission violates these APA requirements. It is the result of a preordained conclusion rather than agency "open-minded[ness]" (*Rural Cellular Ass'n*, 588 F.3d at 1101), and the 31-day comment period provided by the agency, which encompassed the 2021 holiday season, was insufficient to provide a meaningful opportunity to comment.

106.    The 2022 Rescission must therefore be set aside. 5 U.S.C. § 706(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs National Association of Manufacturers and Natural Gas Services Group, Inc., respectfully request that the Court enter judgment in their favor and that the Court:

(a.)    "[S]et aside" the 2022 Rescission in its entirety pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

(b.)    Issue any interim relief that this Court deems appropriate, including pursuant to 5 U.S.C. § 705;

(c.)    Issue a declaratory judgment declaring that the 2022 Rescission is unlawful and void;

(d.)    Enjoin Defendants from enforcing or otherwise carrying out the 2022 Rescission;

(e.)    Award Plaintiffs their attorneys' fees;

(f.)     Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: July 21, 2022

Respectfully submitted,

/s/ *Debbie E. Green*

Erica T. Klenicki (*pro hac vice* to be filed)
NAM LEGAL CENTER
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of Manufacturers*

Paul W. Hughes (*pro hac vice* to be filed)
Andrew A. Lyons-Berg (*pro hac vice* to be filed)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Debbie E. Green (TBN 24059852)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
(214) 295-8000
dgreen@mwe.com

*Counsel for Plaintiffs*